UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**JACOB FAY LUKE, SR.**                                                         **CIVIL ACTION**

**VERSUS**                                                                      **NO. 19-14605-DMD**

**DOCTOR PETE NEAL/RICHARD, ET AL.**

## ORDER AND REASONS

Jacob Fay Luke, Sr., a state pretrial detainee, filed this federal civil action pursuant to 42 U.S.C. § 1983.  In this lawsuit, he claimed that his rights were violated when he was denied a medical exemption from the use of the normal restraints while being transported and when excessive force was used against him.[1]  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).[2]

In that plaintiff's claims regarding the denial of the medical exemption have already been dismissed with prejudice,[3] only his excessive force claims currently remain pending.  In his complaint, he stated those excessive force claims as follows (without any corrections for grammar, spelling, or punctuation):

> Transport Sgt. Trent; On 9/19/19 Sgt. Trent came up to me while sitting on bench w/ hand @n leg retraints on already told me to stand up to put "Box" on for court I then informed Sgt. Trent the "Box" hurts me he then left and came back with "Nurse" @n said nothing's with me:  I then told Sgt. Trent I refuse court bring me back to my cell/living area, Sgt. Trent then twiced my arm @n wrist with force trying to put "Box" on "Quote still sitting down on Bench" also use all weight to step on leg chains pulling me down, then pull me on my feet @n carry me from Jumper Right side from "Hallway by female pod – Door 41 to outside to van,"

---

[1] Rec. Doc. 1.
[2] Rec. Doc. 62.
[3] Luke v. Neal, Civ. Action No. 19-14605, 2020 WL 5646997 (E.D. La. Sept. 1, 2020), adopted, 2020 WL 5645920 (E.D. La. Sept. 22, 2020); Rec. Docs. 31 and 32.

really hurting my neck, shoulder, @n private part/nut's pulling up on Jumper so high @n hurting Ankles cause couldn't keep up with leg restraints:

<u>Lt. Authement</u>; On 9/19/19 Lt. came up to me seat down @n grabbed my right Arm with force twiced It @n pulling up high In the Air cause I didn't want to deal with the pains the "Box" have me but now Lt. was hurting me even more, then when we got to Door 41, Lt. grabbed my Jumper on Left side lifting up high/carring me from Jumper really dragging me like a dog to the van hurting my neck, Ankle's, Arm, @n nut's/private part; Head:

<u>Sgt. Billiot</u>; On 9/19/19 Sgt. grabbed my left arm twisted @n pulling It really hurting me with force when I was just sitting on bench with hand @n leg restraint's already on not resisting pulling on my arm like a tuggle war him @n Lt. Authement, then grabbed me by my left side Jumper pulling me to my feet @n lifting/dragging me with Sgt. Trent to Door 41 till released by Lt.:

<u>Sgt. Dice</u>; On 9/19/19 Sgt. Grabbed my arm's pulling them trying to put "Box" on me but was having trouble cause all the other Sgt. was still using other force, then Sgt. Dice went to get the retraint chair to "Roll" me to van @n placed on side me by bench:

<u>Sgt. Johnson Cady</u>; On 9/19/19 Cady Sgt. was standing on left side holding here "Body Camera" on the whole time this was happening:[4]

He also asserted a related claim against defendant Bergeron, alleging:

<u>Warden Stephen Bergeron</u>; States on my grievance form I filed on 9/19/19 that medical has Denied me of Injuries and he said I will go to court with "Proper Retraint's" not even taken the time to see or ask question's Just agreeing with a "Nurse" say's that he allows to work at T.P.C.J.C. which should have been "Investigated" because this was the second time I reported this causeing the Lt. @n Sgt.s to use "Excessive Force" and agree with It; "hurt me @n Dragging me by Jumper to van":[5]

---

[4] Rec. Doc. 1, pp. 5-6.
[5] <u>Id.</u> at p. 5.

The defendants have filed a motion arguing that they are entitled to summary judgment on those claims based on qualified immunity.[6] Regarding qualified immunity, the United States Fifth Circuit Court of Appeals has explained:

> Qualified immunity shields government officials from civil liability in their individual capacity so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. It protects all but the plainly incompetent or those who knowingly violate the law.
> Our qualified-immunity inquiry is two-pronged. First, we ask whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right. Second, we ask whether the right was clearly established. We can analyze the prongs in either order or resolve the case on a single prong.

Cunningham v. Castloo, 983 F.3d 185, 190-91 (5th Cir. 2020) (citations and quotation marks omitted).

"When an official raises qualified immunity on summary judgment, … the plaintiff bears the burden of showing that the defense does not apply." Id. at 191. In addition, the traditional burdens imposed on the parties are altered. Specifically, the United States Fifth Circuit Court of Appeals has explained:

> Qualified immunity changes the nature of the summary-judgment burden, how and when the burden shifts, and what it takes to satisfy the burden.
> A plaintiff suing for a constitutional violation has the ultimate burden to show that the defendant violated a constitutional right – that is, the plaintiff must make this showing whether or not qualified immunity is involved. But when qualified immunity is involved, at least in this circuit, a plaintiff has the additional burden to show that the violated right was "clearly established" at the time of the alleged violation.
> This expanded substantive burden isn't the only special feature of qualified immunity. Burden shifting changes, too. Under the ordinary summary-judgment standard, the party who moves for summary judgment bears the initial burden to show that there is no genuine dispute as to any material fact and the movant is

---

[6] Rec. Doc. 54. In the motion, the defendants noted that individual listed in the complaint as "Transport Sgt. Trent" was in fact Sgt. Joel Drickamer and the individual listed as "Sgt. Dice" was actually Correctional Officer Christopher Geist.

> entitled to judgment as a matter of law. The movant satisfies this burden by showing that a reasonable jury could not find for the nonmovant, based on the burdens that would apply at trial. For a defendant, this means showing that the record cannot support a win for the plaintiff – either because the plaintiff has a failure of proof on an essential element of its claim or because the defendant has insurmountable proof on its affirmative defense to that claim. The defendant can show this by introducing undisputed evidence or by pointing out an absence of evidence to support the plaintiff's case. If the defendant succeeds on that showing, the burden shifts to the plaintiff to demonstrate that there is a genuine issue of material fact and that the evidence favoring the plaintiff permits a jury verdict in the plaintiff's favor.
>
> But that changes with qualified immunity. When a public official makes a good-faith assertion of qualified immunity, that alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available. In other words, to shift the burden to the plaintiff, the public official need not show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law.
>
> Once the burden is on the plaintiff, things briefly sound familiar again: The plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury. That would be the same if the plaintiff did not face qualified immunity. But, to overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law. This requires the plaintiff to identify a case – usually, a body of relevant case law – in which an officer acting under similar circumstances was held to have violated the Constitution. While there need not be a case directly on point, the unlawfulness of the challenged conduct must be beyond debate. This leaves the rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the challenged conduct is sufficiently clear even though existing precedent does not address similar circumstances.
>
> Moving from the bar to the bench, qualified immunity similarly changes the court's normal task on summary judgment. A court decides whether summary judgment is appropriate by viewing the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor (so far normal), then determining whether the plaintiff can prove a constitutional violation (still normal) that was clearly established (not normal).

State <u>ex rel.</u> <u>Estate of Joseph v. Bartlett</u>, 981 F.3d 319, 329-30 (5th Cir. 2020) (footnotes, quotation marks, brackets, and ellipsis omitted).

In the instant case, plaintiff was ordered to respond to the defendants' motion for summary judgment,[7] and, at plaintiff's request,[8] his deadline for submitting his response was extended to June 21, 2021.[9]  To date, the Court has received no response from plaintiff.  Nevertheless, for the following reasons, it is apparent that the defendants' motion has merit, that plaintiff's claims fail on the first prong of the qualified immunity analysis (i.e. the facts, even when viewed in the light most favorable to plaintiff, do not show that the defendants' conduct violated a constitutional right), and that summary judgment is warranted.

In support of their motion, the defendants submitted evidence establishing:

1. The jail's procedures require that **all** inmates being transported by jail personnel are required to wear "a device called a 'Black Box' which is fitted between an inmate's handcuffs to prevent tampering with the restraints.  A chain runs through the 'Black Box' and then encircles the inmate's waist.  Such a device is a standard security device …."[10]

2. "[T]he only exception to the use of the 'Black Box' would be if an inmate has a medical issue of some type which would prevent its use and then the medical department would so advise Transportation that such a device should not be used on that inmate."[11]

---

[7] Rec. Doc. 56.
[8] Rec. Doc. 60.
[9] Rec. Doc. 61.
[10] Rec. Doc. 54-5, pp. 1-2 (affidavit of Maj. Sgt. Joel Drickamer).
[11] Id. at p. 2.

3. Prior to the incident at issue in this lawsuit, plaintiff refused use of a 'Black Box,' "maintaining that he had a 'pinched' nerve and [a] 'Black Box' would cause additional damage to that nerve as well as pain."[12]

4. Based on plaintiff's assertion, Maj. Sgt. Drickamer "proceeded to the medical department and inquired of a nurse there if inmate Luke had a 'pinched' nerve or any other medical condition that would prevent the use of the 'Black Box' on him. After a review of the medical records of inmate Luke by the nurse [Drickamer] was told that he, inmate Luke, had no pinched nerve or any other medical condition that would prevent the 'Black Box' from being placed on him for security purposes."[13]

5. In connection with this lawsuit, the jail's medical administrator has since reviewed plaintiff's jail medical file and confirmed that "at no time were there any medical findings from any diagnostic tests or evaluations that would prevent the use of a 'Black Box' on Plaintiff Luke, in particular as of the date of the alleged incident in this lawsuit on September 19, 2019."[14]

The defendants also submitted video recordings from the facility's security cameras and the officers' body cameras showing the incident at issue in this lawsuit.[15]

Because plaintiff was a pretrial detainee at the time of this incident, his excessive force claims fall under the Due Process Clause of the Fourteenth Amendment. See Kingsley v. Hendrickson, 576 U.S. 389, 400 (2015); Benoit v. Bordelon, 596 F. App'x 264, 267 n.2 (5th Cir. 2015) ("An excessive force claim brought by a convicted inmate lies under the Eighth Amendment,

---

[12] Id.
[13] Id.
[14] Rec. Doc. 54-9, p. 2 (affidavit of Richard Neal).
[15] Rec. Doc. 57.

while that of a pre-trial detainee lies under the Fourteenth Amendment."). In Kingsley, the Supreme Court the held that to prevail on such a claim "a pretrial detainee must show only that the force purposely or knowingly used against him was **objectively unreasonable**." Kingsley, 576 U.S. at 396-97 (emphasis added). The Supreme Court further explained:

> A court (judge or jury) cannot apply this standard mechanically. Rather, objective reasonableness turns on the facts and circumstances of each particular case. A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. A court must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.
> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. We do not consider this list to be exclusive. We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force.

Id. at 397 (citations, quotation marks, and brackets omitted).[16]

---

[16] Prior to Kingsley, the rule in this federal circuit was that excessive force claims brought pursuant to the Fourteenth Amendment by pretrial detainees were to be considered using the same analysis as employed when considering excessive force claims brought pursuant to the Eighth Amendment by convicted prisoners. Valencia v. Wiggins, 981 F.2d 1440, 1446-47 (5th Cir. 1993). Under that analysis, courts were to employ the **subjective** standard announced in Whitley v. Albers, 475 U.S. 312 (1986), and Hudson v. McMillian, 503 U.S. 1 (1992), which looked to "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." Valencia, 981 F.2d at 1446 (internal quotation marks omitted). In making that determination, courts were to consider the following factors: "the extent of the injury suffered"; "the need for the application of force"; "the relationship between the need and the amount of force used"; "the threat reasonably perceived by the responsible officials"; and "any efforts made to temper the severity of a forceful response." Hudson v. McMillian, 962 F.2d 522, 523 (5th Cir. 1992).
  In Kingsley, the Supreme Court expressly rejected the **subjective** standard of Whitley and Hudson, holding that those cases are relevant to a Fourteenth Amendment excessive force claim "only insofar as they address the practical importance of taking into account the legitimate safety-related concerns of those who run jails." Kingsley, 576 U.S. at 401. However, the factors the Kingsley court then identified as being relevant to resolving the **objective reasonableness** closely align with the traditional Hudson factors. Accordingly, when assessing a Fourteenth Amendment excessive force claim, the Hudson factors (and jurisprudence) are still relevant to the determination of whether the force at issue was **objectively reasonable**, although, obviously, **not** as to any issues concerning the

However, before addressing those factors, the Court will first preliminarily note that plaintiff's claims turn on three issues: (1) whether he had been granted a medical exemption from the use of the "Black Box" security devices; (2) whether excessive force was used to place the "Black Box" on him on September 19, 2019; and (3) whether excessive force was then used as he was being escorted to the transportation van on that date.

On the first of those issues, the defendants have presented evidence establishing that plaintiff had **not** been granted a medical exemption to the use of the "Black Box," and plaintiff has submitted no evidence to the contrary.

On the second and third issues, it is important to remember that what actually occurred during the incident was documented in the videos the defendants have submitted for this Court's review. When such video evidence exists, a court must "view[] the facts **in the light depicted by the videotape**" – even when addressing a motion for summary judgment. Scott v. Harris, 550 U.S. 372, 381 (2007) (emphasis added). In Scott, a case involving such a video, the United States Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial

---

officer's **subjective state of mind**. See Thompson v. Beasley, 309 F.R.D. 236, 247 (N.D. Miss. 2015) ("In answering [the question of whether a use of force was excessive under the Fourteenth Amendment], the Court turns to the Hudson inquiry, which has been used for nearly twenty-five years to determine whether a corrections officer's use of force was wanton and unnecessary, that is, whether force was excessive. However, in a departure from the pre-Kingsley jurisprudence, the Court need only ask whether the force was unnecessary – not whether the use of force was so unnecessary as to show the requisite state of mind to support an Eighth Amendment excessive force claim." (citation and quotation marks omitted)); accord Brown v. Gusman, Civ. Action No. 15-1491, 2015 WL 6827260, at *4 (E.D. La. Nov. 6, 2015) ("[W]hatever the ultimate impact of Kingsley may be on this Circuit's traditional analysis, one thing is clear: the … Hudson factors still play a role in a court's analysis of a Fourteenth Amendment excessive force claim.").

Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). **When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.**

Scott, 550 U.S. at 380 (emphasis added). Accord Carnaby v. City of Houston, 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.").[17]

With those guiding principles in mind, the Court will now consider each of the factors identified by the Kingsley court as relevant to a Fourteenth Amendment excessive force claim.

### *Relationship Between the Need for the Use of Force and the Amount of Force Used*

"The amount of force that is constitutionally permissible ... must be judged by the context in which that force is deployed." Ikerd v. Blair, 101 F.3d 430, 434 (5th Cir. 1996). Here, the videos document both that little force was required and that little was in fact employed. Those

---

[17] That said, it must be noted that the United States Fifth Circuit Court of Appeals has cautioned:

> Scott was not an invitation for trial courts to abandon the standard principles of summary judgment by making credibility determinations or otherwise weighing the parties' opposing evidence against each other any time a video is introduced into evidence. Rather, Scott was an exceptional case with an extremely limited holding. A court should not discount the nonmoving party's story unless contrary video evidence provides so much clarity that a reasonable jury could not believe his account. When video evidence is ambiguous or in fact supports a nonmovant's version of events or when there is any evidence challenging the video's accuracy or completeness, the modified rule from Scott has no application. Only when the record eliminates any feasible claim that the nonmovant's account of events is true may a court disregard the normal summary judgment rule that it must credit that party's account if it is supported by sufficient evidence.

Aguirre v. City of San Antonio, 995 F.3d 395, 410-11 (5th Cir. 2021) (citations, quotation marks, and brackets omitted). Here, however, the videos capture the events from different angles, and the Court has no reason to doubt their accuracy or completeness; moreover, plaintiff has not challenged them on such bases.

videos clearly show: Plaintiff objected when the officers first tried to attach the "Black Box," claiming that his medical file showed that a "Black Box" was not to be used on him. At that point, the officers' efforts ceased, and one officer left to determine whether that assertion was true. Shortly thereafter, that officer returned and stated, "I checked with Medical, and Medical said you were perfectly fine. Medical said you are perfectly fine to go just like this." The "Black Box" was then quickly attached without incident.

In light of the videos, it is apparent that plaintiff, without an objectively verifiable excuse, continued to object to the use of the routine restraints employed on all inmates being transported from the facility. "When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force." Soto v. Dickey, 744 F.2d 1260, 1267 (7th Cir. 1980).

Here, plaintiff lied to the officers, falsely claiming that his medical records prohibited the use of a "Black Box" on him. When an officer checked and confirmed that was untrue, plaintiff continued to object to the use of the device. At that point, the officers reasonably believed that plaintiff was simply being non-compliant or defiant, and they were therefore allowed to use some measure of force to enforce compliance.

The measure of force they then used was so negligible as to be practically non-existent. Although plaintiff was uncooperative and continued to complain that he was being hurt, the video shows that only minimal force was used in attaching the "Black Box," an action which took a matter of seconds. Moreover, when plaintiff was subsequently escorted from the bench where he

had been seated to the transportation van, nothing at all remarkable occurred. He was **not** dragged as he alleged in the complaint, and no struggle whatsoever took place between him and the officers.

### *Extent of the Plaintiff's Injury*

Although plaintiff stated on both the videos and in the complaint that the officers' actions caused him pain, he does not allege that he was actually physically injured in this incident. Although not alone precluding relief, "the absence of serious injury is quite relevant to an excessive force inquiry." Baldwin v. Stalder, 137 F.3d 836, 839 (5th Cir. 1998). Moreover, to the extent that pain **without injury** is relevant to a claim such as this, there is simply no objective evidence whatsoever that plaintiff in fact experienced such pain. On the contrary, the videos show that the officers' actions during this incident were unremarkable and could not reasonably have been expected to have resulted in pain. Further, plaintiff has offered no evidence which would indicate that he was peculiarly susceptible to such pain.[18]

### *Efforts Made by the Officer to Temper or to Limit the Amount of Force*

The defendants have offered no evidence or argument concerning this factor. However, in that the force used on this occasion was negligible, there was nothing to temper or limit.

### *Severity of the Security Problem at Issue and*
### *the Threat Reasonably Perceived by the Officer*

When this incident occurred, plaintiff and his fellow inmates were in the process of being transported, and the facility's security protocols required **all** inmates – except those having a

---

[18] Although plaintiff has claimed in this lawsuit that the use of a "Black Box" is painful to him because he has a pinched nerve, that contention has already been considered and rejected in this litigation. Although plaintiff alleged that an MRI report documented a pinched nerve, that was not true – the MRI report in question did **not** document a pinched nerve. See Rec. Doc. 1-1, p. 2 (MRI report authored by Dr. Jessica A. Borne); see also Luke v. Neal, Civ. Action No. 19-14605, 2020 WL 5646997, at *2-3 (E.D. La. Sept. 1, 2020), adopted, 2020 WL 5645920 (E.D. La. Sept. 22, 2020).

documented medical exemption – to wear "Black Boxes" while being transported. Although plaintiff had no such medical exemption, he was nevertheless refusing to submit to the officers' legitimate orders to wear the required security device. If the officers had allowed that refusal to go unanswered, it might well have caused the other inmates to similarly refuse or otherwise disobey the transporting officers' orders. The officers were not compelled to countenance such an unnecessary and unwarranted threat to prison discipline and security. See Martin v. Seal, Civ. Action No. 11-726, 2014 WL 2890125, at *6 (E.D. La. June 25, 2014) ("While a single prisoner's flagrant disobedience might pose no immediate threat, it obviously could serve as a catalyst for more widespread misbehavior which could quickly escalate out of control."); see also Rivers v. Jones, Civ. Action No. 19-372, 2021 WL 2389646, at *3 (M.D. La. May 11, 2021) ("[I]t is recognized that an inmate's noncompliance with direct verbal orders … is … a relevant threat to be considered due to the disturbance this may cause in an institutional setting."), adopted, 2021 WL 2386195 (M.D. La. June 10, 2021); Jackson v. Cleveland, Civ. Action No. 20-2247, 2021 WL 1269587, at *8 (E.D. La. Mar 8, 2021), adopted, 2021 WL 1267790 (E.D. La. Apr. 6, 2021).

### ***Extent of the Plaintiff's Active Resistance***

In this case, plaintiff orally objected to the officers' efforts to apply the "Black Box"; however, he only exhibited minimal physical resistance after being informed that the medical personnel had said the device could be used, and he did not resist at all while being escorted from the bench to the van after the device was attached.

In summary: Facility protocols required that all prisoners, except those having a documented medical exemption, wear a "Black Box" restraint while being transported from the jail. Plaintiff had no such medical exemption. Plaintiff nevertheless orally objected to the use of

the device, claiming that his medical condition made the device painful for him. After he voiced that objection, an officer checked with the facility's medical personnel, and the officer was told that plaintiff was "perfectly fine" and the device could be used. Plaintiff nevertheless continued his oral objections, and so the transporting officers used a negligible amount of force to attach the device. Once the device was attached, plaintiff was escorted to the transportation van without any use of force and without incident.

Because plaintiff's disobedience took place in full view of his fellow inmates, and because facility policy required that both plaintiff and those other inmates submit to the use of a "Black Box" during transportation, it was necessary and appropriate for the officers to use a measure of force to gain plaintiff's compliance. The unchallenged video blatantly contradicts plaintiff's version of events and irrefutably shows that the force the officers employed was negligible and certainly no more than was required to gain that compliance. Because the force used in this case was objectively reasonable, it cannot be deemed "excessive." Therefore, simply put: the current record, taken as a whole, could not lead a rational trier of fact to find that a constitutional violation occurred in this case. As a result, plaintiff's excessive force claims fail on the first prong of the qualified immunity analysis, and the defendants are entitled to summary judgment.

Lastly, out of an abundance of caution, the Court notes that plaintiff's related claim against Warden Bergeron also fails. Plaintiff does not accuse Bergeron of himself using excessive force; rather, he faults Bergeron for not taking appropriate action based on the related grievance plaintiff filed. That claim is clearly frivolous for two reasons. First, an inmate has no constitutional right to an adequate and effective grievance procedure or to have his complaints investigated and resolved to his satisfaction. Bonneville v. Basse, 536 F. App'x 502, 503 (5th Cir. 2013); Propes

v. Mays, 169 F. App'x 183, 184-85 (5th Cir. 2006); Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005). Second, in any event, even if Bergeron did in fact reject plaintiff's grievance concerning the use of excessive force and the requirement that he submit to the use of the "Black Box," that rejection was warranted because – again – excessive force simply was not used and there is no medically documented reason that would prohibit the use of the device on him.

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment, Rec. Doc. 54, is **GRANTED** and that plaintiff's remaining claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the final pretrial conference and the trial scheduled in this case are hereby **CANCELED**.

New Orleans, Louisiana, this 24th day of June, 2021.

**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**